Center for Individual Freedom Appellant, Ms. Kerby for the Appellant, Ms. Carroll for the FEC Center for Individual Freedom Appellant, Mr. Carroll. May it please the Court, I'm Tom Kerby, Counsel with the Center for Individual Freedom. I'll be arguing on behalf of the appellants. I'd like to reserve five minutes for rebuttal. This appeal concerns the validity of an FEC regulation. That regulation provides that if corporations or labor unions independently spend for election and communications, which is a particular category of political speech, they then must report and disclose contributions they receive, quote, for the purposes of furthering, close quote, that type of speech. In a moment of bipartisan unity, the FEC borrowed that standard from the statute that was amended to regulate election and communications. That standard applied to contributions made to parties engaged in so-called express advocacy. Express advocacy being speech that explicitly advocates for or against an identified candidate using one of the buggly magic words, vote for, elect, defeat, that sort of thing. Plaintiff appellant, congressman, forgive me all of his titles that I know of, Van Hollen persuaded the district court initially that this regulation, that borrowing this standard from the underlying statute, violated the statute itself. And the district court struck down the regulation at step one of Chevron, holding there was a clear prohibition of the use of this regulatory standard. We appealed, and this court reversed. This court held that if you look at the statutory language on its face or using all of the traditional tools of statutory construction, there is room for this regulation, for this regulatory standard. It was not clearly prohibited. There was a gap for the FEC to fill. And this court remanded to the district court to consider Chevron step two and to consider related APA arbitrariness issues that the district court had not reached because it had found a clear statutory prohibition of this regulation. On remand, the district court, nothing daunted, again struck down the regulation. The district court said, okay, the statute doesn't preclude this regulation, this regulatory standard, but nonetheless this standard is forbidden by the statutory language and purpose. And because it violates the statutory purpose clearly, it's also arbitrary and capricious to use this regulatory standard. And so once again, the district court struck the statute down. Once again, we have appealed. In our briefs, we discuss a number of reasons that we respectfully disagree with the district court. But there are two overarching points that I'd like to focus on this morning, subject to the guidance of the court, of course. And the first of those points is this. Contrary to the district court's belief, this statute does not require the Federal Election Commission to maximize contributor disclosures at all costs. It is certainly true that when Congress decided to go beyond regulating express advocacy and regulate election and communications, Congress intended for the contributions related to election and communications to be subject to disclosure provisions. And in that sense, these election and communication amendments were intended to increase disclosure. But Congress never said, we have to have absolute disclosure without regard for costs or other considerations. Secondly, and this I think is interesting as well, there is no evidence that imposing the broader contributor disclosure standard on election and communications, the standard for which Congressman Van Hollen advocates, there is no evidence that imposing that more intrusive and more burdensome standard would produce more contributor disclosure. And the reason is very simple. Election and communications and express advocacy are mutually exclusive. Under the statute, if you've got express advocacy, you do not have an election and communication. The statute provides an explicit standard of disclosure for express advocacy, namely contributors who contributed for the purpose of supporting that speech. So if anyone faced what they thought was a burdensome or intrusive disclosure standard because they were engaging in election and communication, and remember, an election and communication already mentions a candidate or it's not an election and communication. All they have to do is drop in one of the bubbly magic words, vote for, reelect, beat, something like that. That kicks them over into the statutory regime for express advocacy, and their only obligation at that point is to disclose contributors who contributed for the purpose of supporting the speech. Now we don't have to speculate that that would happen because we had a laboratory experiment during the time that the district court's first ruling was in effect, and as we discussed in our papers, that's exactly what happened. Well, let me come back to this first point, which I think is really ultimately the determinative point, that the statute simply doesn't have this unlimited disclosure purpose that seems to underlie the whole district court. You have to make it sufficiently inconsistent with what the district court ruled, sufficiently ambiguous that you should have ruled differently if they did. Yes. Okay. That's right. But she really does. I'm sure I can just say she read the decision, but of course she read the decisions. I don't mean to say that, but you really, as you read her decision, she relies on the belief time after time after time that there is this intent on the part of Congress to require essentially a maximum disclosure, unlimited disclosure, and then she says, and these various considerations undermine that purpose. But that's not what Congress did, and I... You know, there is constitutional interest on the other side, which has always been a puzzle to me, because there's a line of Supreme Court cases, it's not just McIntyre, it's the Stratton and the Watchtower case, and several others that say that there's a part of the freedom of speech is the right to make anonymous speech. That's right. And the Supreme Court, in upholding the McCain-Feingold law, failed to mention that line of authority is still there. And so... And I noticed that the Federal Election Commission at least hints at it, it doesn't cite the cases and whatever, but it's a puzzle about how to square McCain-Feingold decision, or the McConnell decision, with that line of authority, and in fact there's an opinion by Judge Easterbrook on the Seventh Circuit, I don't know if you're familiar with Majors v. Abel, where he filed an opinion, and it was not concurring or not dissenting or anything, it was just called, I don't know. Dubitante. Dubitante. Well, Your Honor, here's my best effort at reconciling those principles for purposes of this case. I happen to think the ability to speak anonymously is very important, and it's gotten short shrift. So did the Federalists. Yeah. But shifting to what is necessary for the disposition of this case, the Supreme Court in Buckley and its progeny have said that at minimum, you have to recognize the compelled disclosures of this type are a substantial burden on speech. Now they've said that burden can be sustained if it's reasonably tailored and sufficiently necessary to achieving a sufficiently important government interest. But what the Supreme Court has told us at least is where you're imposing this burden of disclosure, you have to have tailoring of some kind. You have to show that what you're doing is necessary. Now the District Court seemed to believe that because the Supreme Court had allowed compelled disclosure in a number of cases, that there was no longer any constitutional concern. And the people can just freely compel disclosure willy-nilly. But that's not what the Supreme Court has said. And one of the things the FEC said in adopting this regulation was, we're trying to balance these various associational privacy rights against the needs of the statute. And we think we've achieved that because we have adequately tailored the statute. They tailored the statute by limiting the scope of disclosure with respect to election and communications to what the Supreme Court had said in Massachusetts Citizens for Life was exactly the kind of disclosure necessary with respect to express advocacy. The District Court's decision with respect to that was to say, let me see if I actually copied that down. It certainly was a striking statement. I didn't actually quote it in my notes. But what the District Court said was, Congress didn't order tailoring, Congress ordered exactly the opposite. Well, I don't think Congress did, number one. But number two, there would be a very interesting question, whether Congress in the regulation of core political speech could order that there be no tailoring. I don't think it did. I think the Federal Election Commission undertook tailoring here, and I think that's one of the many reasons. And I noticed that the District Court summarized the opinion and gave three reasons at the beginning of that opinion. The second reason, that strikes me as totally incorrect on the basis of the record, it says that no commentator asked the agency to include a purpose requirement. That's just not accurate. That is not accurate. The Alliance for Justice asked exactly for that. That is right. Moreover, in the notice of proposed rulemaking, the agency told everyone, here are the two polar possibilities of regulations we might adopt, but we're also thinking about doing something in the middle. And they said, we'd like comments on whether or not it would be wise to adjust the disclosure standard. It's almost in the language they end up using. In fact, there were comments that supported that particular approach, Your Honor. But even if there had not been, once the agency up front discloses this is the kind of thing we're thinking about doing, then they're free to go ahead and do it, even if nobody elects to comment at all. But you're right, there were comments, and the comments did support the outcome that we have here. And that outcome is consistent with the important message, as I said, I'll talk about anything you want me to talk about, but my message today is what the FEC did is fully consistent with the language of the statute. And we know that for four reasons. The first reason we know, we've already talked about a little bit, is it's consistent with the language of the statute, both on its face and when read using traditional tools of statutory construction. And we know that because this Court has told us so. So we can start with that proposition that this regulation is consistent with what the statute actually says. Secondly... The regulation changed from the contribute language to donate language. Is there an explanation for, A, why they did that, and B, what they thought the effect of it was? Well, Your Honor, the first time they established this regulation in this area... Let's go with the one we've got now. When they got to the one we've got now, they went back to contribute. I don't know why they went back to contribute, but it is the statutory language. They said they were borrowing the language relating to express advocacy, and I suppose they thought that made sense. The original regulation dealing only with individuals and partnerships... So they went back and forth between donate and contribute. That's right. I guess it doesn't matter why.  That's entirely a red herring, Your Honor. There weren't any individuals and partnerships asking for any changes with respect to this proposed... The second piece of the rule is that herring rule.  That's exactly right, Your Honor. That's exactly right. But the second reason we know that what the regulation did is consistent with the regulatory purpose is this business of how the Federal Election Campaign Act, which is the controlling statute here, treats expressed advocacy. You'll recall that the statute that provides for regulation of electionary communications is an amendment to FECA. FECA is the overriding statute. FECA is explicit that with respect to express advocacy, people explicitly saying, vote for or elect this candidate, it's enough if they disclose contributors who contributed to support that kind of speech. Now, if Congress really intended through FECA to demand unlimited disclosure of all contributions without regard to contributor purpose, it would make no sense to have that very limited disclosure with respect to the clearest form of political advocacy. So we know from the structure of the statute that Congress was not in this statute attempting to achieve unlimited disclosure with respect to contributions. It's hard for me to understand where the application of this falls in the corporate field. It seems that it's just got to be non-profits. I mean, people don't donate money to Microsoft or Ford Motor Company or whatever. They're the general treasury. Do they? I think, Your Honor, the primary effect is upon non-profit corporations. Many non-profit entities are, in fact, incorporated. And the regulation doesn't distinguish between business corporations and non-profit corporations. They're all covered by this regulation. I think with business corporations... Why do 1C3 corporations have to disclose in their returns filed with the Internal Revenue Service the names of people that give them gifts and contributions? There is some such disclosure requirement, Your Honor. If you push me very far into that, I'm not a tax lawyer. But it is true that there is a requirement of disclosure. Now, I'm not sure... Is that considered... Are the names of the contributors considered return information that the IRS has prohibited from disclosing? I'm going to turn around and look to my co-counsel. It is not publicly available. May I consult with my expert here? Get ready to consult with his expert afterwards. It's on the confidential part of the form. And I'm told names and addresses are not disclosed. I had believed that to be true. But this is the gentleman in that. So this is a disclosure that wouldn't be required otherwise. As to whether for-profit businesses sometimes receive contributions, Your Honor, it gets into the whole question of what do you mean by a contribution. There are contributions to capital. There may be contributions to retirement funds that are owned by the corporation. The corporation may have charitable operations or employee picnic areas or all sorts of things that may get contributions of one kind or another. And this all sounds very far removed from federal election campaign issues, except that if you accept Congressman Van Hollen's position that whenever the corporation makes substantial expenditure out of its general funds, it has to identify all of its contributors, that's the kind of disclosures you start getting. A for-profit corporation spends money on a radio ad up in Washington State and they got a contribution to an employee area down in Louisiana and they've got to disclose that as if it means something with respect to their speech up in Washington State. Your Honor, I see that I'm into my rebuttal time here. I would like to reserve that time. Thank you. Thank you. Good morning. May it please the Court. Katherine Carroll on behalf of Apple League, Congressman Chris Van Hollen. I want to start by saying that we agree completely with Mr. Kirby's proposition that the statute here doesn't call for totally unbounded disclosure. It clearly has the thresholds, it has the option of the segregated account. The problem with this rulemaking, though, is that it swings the pendulum completely in the opposite direction. The purpose limitation that the FEC enacted opens up a significant loophole that, just as in this Court's decision in Shays, makes it not only eminently possible for groups to circumvent the disclosure requirement, but actually provides a clear roadmap for doing so. That puts this case on all fours with the Shays decision because the FEC completely and totally failed to even think about the problem, the obvious likelihood of mass circumvention of this rule. Now... Is there evidence that the... Do you agree that the disclosure requirements for express advocacy have a purpose element to them, that the donation has to be for the purpose of allowing that speech? There is language in the statute applicable to those disbursements that calls for that. Is there evidence of what you call the mass circumvention of that disclosure regime? I mean, I think that concerns have been raised over time about the way that the Commission has implemented that language. You mean... Is there mass circumvention of... Is that a huge loophole? I mean, as I said, I think that concerns have been raised about whether it does lead to precisely the same sort of problem, which, you know, is one reason why, when the Commission was enacting this rule, it needed to think about, maybe, if the Commission had explained that it was considering the possibility of evasion, that it was considering the differences... I'm not sure that those categories, by the way, make any sense anymore. But if they ever did, on electioneering and express advocacy... But in looking at it, the only difference between the disclosure requirement is that for express advocacy it's a $200 threshold, and for issue advertising, naming a candidate, it's a $1,000 threshold. Is that it? That's not the only difference. And it's interesting that in the 2003 rulemaking, it was suggested to the Commission that in applying the disclosure requirements under BCRA to the small category of corporations, the qualified non-profits, that would be subject to disclosure. It was suggested that the Commission should adopt for the purpose of rules from the FECA independent expenditure category. And the Commission at that time said, you know, we've thought about that, but we don't think it would make sense here for a few reasons. One is that the thresholds are different, but a second important difference that the Commission acknowledged at that time and totally ignored this time was that in BCRA, Congress's way of tailoring the disclosure requirement was instead of an earmarking rule, we're going to offer up the alternative of the segregated account. If you only want to disclose contributors that contributed to make electioneering communications, then all you have to do is pay for them out of the segregated account. The Commission was not faced with the result of allowing corporations and unions to engage in the communications. So they didn't even have to run their tables on... To be sure, the landscape was different in the 2007 rulemaking, but nevertheless, was it reasonable for the Commission, just four years after it had rejected a parallel regime, to then adopt that parallel regime without even acknowledging the change in position, without explaining why the fact that the segregated account was available, which was a reason it had relied on in 2003, was suddenly no longer adequate to resolve its concerns. And I think that's consistent also with another significant defect in the reasoning of the rulemaking, which is that there's this assumption when the Commission gets around to giving its rationale, we're worried about burden, we're worried about misleading disclosure that's not really going to capture who's supporting it. Those rationales rest entirely, and this is at JA 311, on the assumption, totally unexamined assumption, that customers and investors and corporations, that union members and so on, would count as donors within the meaning of the pre-existing rule. Now, it had been suggested and discussed at length in the administrative hearing that that was not a necessary assumption at all. Many people suggested the Commission could take a different approach and say, you know, we don't think someone who buys a good or a service from a corporation or who invests in a corporation or who's a member of a union would count as a donor. And yet, there is no consideration, zero, in the rulemaking about whether that's an adequate resolution. I was wondering about the change between donor and contributor back and forth. Right. Where are we on that now? So, the language was changed in the 2003 rulemaking and the current regs continue to use the phrase donation. And if you go to the 2003 rulemaking, it explains why the Commission was adopting that language and it's part of their explanation of why we're not importing the rules applicable to contributions under FECA because the Commission recognizes that donations that people make toward electioneering activity are not the same thing as contributions. And in fact, BCRA doesn't use the word contribution. It uses contributors who contributed. And the Commission explained, well, we don't think this was meant to bring in the concept of a contribution, which is subject to all of these additional rules under FECA. Bottom line, what are you saying the Commission did here that it couldn't do? Four things. Well, really one thing with four subparts, if I can. What it couldn't do here was adopt a rule that completely failed to consider the relevant aspects of the problem and completely failed to explain... That's a general rule that you can't do that. But tell me what in this case was it that the Commission did? Four things. Well, what the Commission did that it couldn't do? Number one, it couldn't enact a rule that opens the door to massive evasion without considering that possibility and without... I'm sorry, massive evasion of the disclosure requirements. Essentially, we're going to a zero-donor disclosure rule and it doesn't address that possibility. That is exactly the problem that led this Court to vacate the coordinated content standard in Shays. So that's problem number one. Problem number two... Who's going to do the evading? It's not the corporations you're talking about. It's not the labor unions. It's the people that are making the donation. Correct. In McConnell and Citizens United, I think the Court explains kind of what it is that was the real motivating concern behind the new provisions in BCRA. And you're quite right. It's not about corporations, which is why it's a little bit odd that the Commission was so fixated on this concept of profit corporations in their rulemaking. The real concern was groups hiding behind what the Supreme Court called misleading and dubious names, like your Citizens for Better Medicare or your Republicans for Clean Air, who weren't disclosing the donors behind that rule. And the Commission had a situation where, you know, maybe it had a line to navigate. Maybe it needed to figure out a way how do we capture disclosure of those donors, but not necessarily disclosure of customers and investors, but it didn't... Something I can't quite figure out in this maze of regulations and statutes and Supreme Court rules is if I give a donation to a non-profit, the American Cancer Society, and I do it anonymously, what is the, under your thinking about the disclosure, what disclosure does the American Cancer Society have to make under the regulation that you envision? Does it say anonymous? It's testing my knowledge of whether that sort of thing is permissible under the rules, but I think... I mean, that's commonplace for charitable organizations to receive anonymous donations. It's commonplace. But under your rule, what you're proposing, I'm wondering whether that would be prohibited because it wouldn't comply with the Federal Election Act to disclose anonymous. That doesn't tell you anything. I'm not sure that it would be, but I want to be very clear that the question before the Court is not what do I think is the best rule. The question before the Court is whether the rule the Commission adopted... I understand, but what do you think is the best rule? I think Congress wrote a statute that calls for disclosure of all contributors. Now, we'd have to figure out who's a contributor, and as I was saying, I think... That's where we are in the ruling. Right, and I agree that there, especially in light of this Court's earlier decision, there was a line-drawing exercise for the Commission to engage in. Yeah, there is an ambiguity. We've already said that. Exactly, and the question here is when the Commission decided where to draw that line, did it provide an adequate justification? Now, I started to explain the four things. The first of the four items was that they, in your explanation, created the possibility of massive evasion without a discussion... Correct. That's the Shays problem. That's the issue that's indistinguishable from Shays. What's that? Second, the unexamined assumption that donors would include customers, investors, union members, and so on, even though, and I think there's a couple of interesting points on this. Number one, it was... Weren't they dealing with that problem by what they did here? Well... By the purpose use requirement. Right, but I think as your Honor pointed out... So forget that. You're not there on that one. I want to push on it a little bit because... They dealt with it expressly. I want to... I'm sorry. Okay, go ahead. I want to push on that because I think as your Honor pointed out in Republican National Committee versus FEC, when the Commission has an obvious alternative solution to a problem it has pointed out, and totally fails to explain why that solution, why it's rejecting that solution, that's a problem of unreasoned decision making. An alternative initiative? Yes, absolutely. That suggestion that customer business revenue and union members could be excluded was suggested repeatedly, and I can give you the pages in the Joint Appendix. The other interesting thing about that is that the Commission itself in two places took an approach just like this. One was in the 2003 rulemaking when it was discussing what the obligations would be for individual spenders. They said, well, individuals who spend money on electioneering communications have to disclose their contributions, but of course we make clear that that does not include an individual's salary or wages. Nobody thinks that that's a contribution. The second place it did that... Didn't the Commission say just that? Yes. I seem to recall in the rulemaking that the Commission said something to the effect that no one is contending that all sources of revenue that a corporation has should be disclosed. The Commission said that. Yes, and that's exactly why there's a failure of reasoned decision-making here, Your Honor, because if the Commission is acknowledging that, then why are they turning around and saying... Why is there a failure as opposed to a part of the decision-making to say that wouldn't be considered contribution, therefore we're enacting this rule that says it isn't? Because they could have... And they didn't explain why that alternative wouldn't suffice. And it's the alternative that they took, actually, in the interim between the district courts. Actually, the suggestion, as I read it, if we're talking about the same thing, was not an across-the-board suggestion. It wasn't even a suggestion at all. There was commentary saying that non-profit corporations on line one of their internal revenue service form have to disclose whatever it is, contribution, et cetera, et cetera, et cetera. But that was number one. It was only non-profit. And number two, it wasn't a suggestion because the comment went on to say we urge the Commission to enact a regulation that has the purpose element in it. I think that that is the piece of it. Who made this suggestion, other than the Alliance for Justice that you're talking about? So, there was looking at JA 189 to 91 and 194, the suggestion was made that customers who pay fair market value for goods and services should not count as contributors. JA 205 to 206, business income is not contributed or donated and shouldn't be required to be disclosed. But that's exactly why the Commission's analysis makes zero sense. Because what they were saying is if everybody has to disclose customers, investors, union members, and so on, then that will be burdensome and that will be misleading. Therefore, they did what they did here. Right. Therefore, they did what they did here. Your reasoning is not making a lot of sense to me on this point. I'm sorry. I apologize for that. If they offer a reason for what they're doing, that is we shouldn't be including these items, then they enact a rule that says we're not going to include those items. That isn't nonsensical on their part. But to take the extra step and say instead of simply excluding those, we're going to go much further and say even contributors that everybody would agree is a contributor, you still don't have to disclose unless you have earmarked your contribution. And the way that that's going to be enforced is spelled out in the law. Okay, that may be getting us to point three. We have points one and two. Now what is the third thing they can't do? Well, I think this goes to the evasion point where the commission says you're not going to be required to disclose unless the funds were received in response to a specific request for electioneering communications money or specifically designated by the donor. And I'd like to point to the court to... Okay, can you give me points three and four on the things that you say they couldn't do? So points two and three were about the failure to account and the failure to consider an alternative approach of just saying under this rule you don't have to disclose things like customers, investors and so on. And that's actually the approach that the commission took during the interim between the district court's first decision and this court's first decision. It issued a press release in July 2012 where it said here's how we're going to enforce the 2003 rule in the interim while we're waiting for the court of appeals. Is the disclosure requirement for express advocacy a statutory requirement? The purpose part of it? That part is. It's a little bit complicated actually because there are two provisions of FECA that govern disclosure for independent expenditures and only one of them includes that language. But yes it is a statutory provision. So if the commission in adopting the same rule for electioneering communication is arbitrary and capricious then Congress was arbitrary and capricious in requiring it, right? The commission was arbitrary and capricious in adopting it without considering the likelihood that this would lead to massive evasion without considering that it had at least two completely satisfactory alternatives. Did Congress consider it massive evasion? I'm sorry? In enacting the disclosure rules for express advocacy, did Congress consider massive evasion? I think when Congress enacted that language in the 70s it was acting against a very different backdrop than it acted against when it enacted BCRA and adopted different language. Well one of the problems with that statute when it was initially enacted it was a response to the Nixon re-election campaign and Herbert Kalmbach going around getting money from corporations and everything but the other things that were addressed in that statute were not things that had been considered problems before. They addressed far more than the abuses that came up in the Nixon re-election. That sounds right. I think in BCRA though Congress was acting as this court has recognized repeatedly against a backdrop of the sham issue ads where we did not know we have groups with these sort of anodyne misleading names. We don't know who's behind them and so therefore it adopted a regime that differed in some ways. Exactly. I think that's why when the commission enacted this rule it had to at a minimum, maybe it could have reached the same conclusion after considering the consequences on both sides. Considering whether is our rule going to capture the kinds of disclosure that Congress was really worried about. Considering and explaining why it's not adequate to rely on the segregated account. Why it's not adequate to simply clarify as it has done in other circumstances that customers are not donors, investors are not donors, union members are not donors. Those were options that were available to it that would have fully and completely resolved the concerns it expressed. Yet it gives no explanation why it does not take that approach and it gives no explanation why it's parting ways from what it did in the 2003 rulemaking just four years earlier where it was suggested that it should simply parallel the independent expenditure regime and the commission said no, here are several reasons why we think that doesn't make sense. It didn't consider any of that in the 2007 rulemaking and we think that's essentially why there's a failure here of reasoned decision making and it's a world where instead of having the tailored disclosure that Congress sought, we instead have a situation where there's essentially zero disclosure and I have yet to hear an explanation from the interveners of how this case differs in any meaningful respect from this court's decision in Shays, which I think requires affirmance of the district court's judgment. Unless the court has further questions, I see my ten seconds are up. Thank you very much. Being a lawyer, your honors, I have a great deal I would like to say, but I don't think there's anything I need to say. I propose to submit. Well, I do have one question. How does this case differ from Shays? This case differs from Shays in that the commission here was faced with a situation in which it had clear evidence of a burden that it was trying to address and it addressed it in a way that Congress had specifically laid out as an appropriate way to address this kind of situation and as to which there was no evidence of the kind of evasion that you've been told is going to happen. Where were the rulemaking comments that said you've had this standard for electioneering communications and with respect to electioneering communications, it's being evaded because there are people out there that have large sums of money that want to give it to speakers without imposing any restrictions on how it's used and without regard to the grounds on which it was requested. Now, if there really are people like that, I'd like to know who they were because I'd like to get in on that. But that wasn't shown to be real in this rulemaking and what the FEC did was entirely rational. What do you say about the question of massive evasion and the Commission's failure to deal with it? Well, first, where was the evidence of that in the record? Well, we have said even recently that you don't always have to have evidence if you've got common sense. The suggestion of the other side is that common sense says that if you can get around a rule that easily, somebody's going to do it. Well, first of all, that shows that they couldn't accomplish anything more because you can always just do express advocacy and you're going to have the regulatory standard we're talking about. But secondly, Your Honor, I put it to you, where are these people that are giving away large sums of money? I left the world of politics long ago and one of the reasons I was invited to do so was I didn't have to raise money anymore. I don't know where they are and I don't understand why you're asking me that. My point is, Your Honor, their whole theory is there are people giving away money without earmarking it and without regard to why it's being asked for. I don't think there are such people. What they are suggesting is that the person comes in to the corporation and says, wink, wink, wink, I'm not giving you this for that advocacy, that electionary communication that you're making, wink, wink, wink, and gives them money. They're not saying the people really are giving it away. That's the whole meaning of their evasion. You're talking about a different category of donor than the one they're concerned about. Shouldn't the commission have dealt with that question? Or should the commission have dealt with it? I think the commission dealt adequately with it by adopting the best standard they could given the structure of the statute and in the absence of any evidence that this had been a problem with respect to express advocacy, Your Honor. I'm sorry, Your Honor. Go ahead. We're not looking for the best regulation here. We're looking for an adequate regulation and we've got one that complies with the statute. We know that. We've got one that uses an approach that Congress has endorsed. We know that. There's no evidence on the record that shows that that approach was irrational. And that's sufficient to withstand the very lenient review at Step to the Chamber. Ms. Carroll says several times this was not reasoned decision making. So the argument seems to be, it's not that they couldn't have done this, they just didn't do a very good job of explaining why they were doing it. They came with this burden and misleading support and that sort of thing. What's your best defense of what the Commission did here in terms of adequately explaining? There's an E&J and I think the E&J does provide a reasoned basis and what it says is that we have a problem here. We have a situation where we need to tailor this statute. It hasn't otherwise been tailored and we do have privacy interests at stake here. Donor privacy interests at stake. We also have uncertainty as to what constitutes a reportable contribution. And some examples were given that clearly are not. For example, somebody who buys a widget from a company, they're not a contributor to a company. But if the American Heart Association enters into a joint venture, perhaps informal with an association somewhere that allows them to use the American Heart Association trademarks and materials and the money that comes in is divvied up and part of that is called a royalty and part of that is called a free will offering and who knows what else is called. I haven't read the testimony. The Commission held an evidentiary hearing which is unusual in rule making. But anyway, was there testimony during the hearing regarding the sort of hypotheticals that you're talking about? Not customer money or not union dues or anything but other things that were clearly being considered a contribution or a donation that have no relationship to elections? It occurred at this level, Your Honor. There was discussion about the fact there's uncertainty here as to what should be identified and aggregated and down in the weeds very far as to what is it exactly you're uncertain about. But the Commission, whose expertise lies largely in enforcing and implementing disclosure requirements, that's what they've been doing since the 1970s, obviously understood what was being talked about there except for the fact that there was a problem and it's easy to understand how something like my American Heart Association example creates a real problem and particularly remember, if the American Heart Association wants to spend $15,000, $10,000 actually, on a radio ad in a rural Washington state under the position that's being advocated here, they would have to go through for the last year, almost two years every money they came in to try to figure out whether it's a contribution or not and to try to then figure out how to aggravate it, then send it to the lawyers to see what has to be reported and the burden of reporting would swamp the expenditure on the speech itself, which is irrational. Well, they have to do it anyway for earmarked donations under the Commission's rule, right? But it's easy to keep track of earmarked donations if you know you're going to have to disclose contributions when you earmark them, either because the donor says it's earmarked, it's easy to say okay, that goes in a bucket over here or if you request contributions for the purpose of speech, it's easy to understand you're going to have to keep track of that nobody said that was a burden there's no evidence of keeping track of earmarked contributions as a burden it's a question, when associations with income flowing in in all sorts of ways perhaps with no thought at the time of engaging in any election and communication speech, later wants to speak a little bit and they're told, well, you've got to go back through that's where the burden the FEC said the burden wasn't identifying what had to be disclosed I want to ask you the same question I asked the opposing counsel what happens if whatever it is the National Waifu Association gets a contribution anonymously they have a problem I do not know that there is an answer to that problem, but I can certainly see the position that could be taken, that by accepting a contribution where you don't know where it came from, you have disqualified yourself from engaging in an election, if it's over a thousand dollars you have disqualified yourself for the next few years from engaging in election and communication, now it's hard to believe that could be sustained under the First Amendment but I get surprised every day by cases sustaining things under the First Amendment If that were permissible then the, then evasion could be rampant but that's not because of any irrationality it's because of the First Amendment Wait, that's exactly right your honor, and if we hypothesize that there are these people who are doing the wink wink nod nod I don't say well they can't come in and say wink wink nod nod, I've got a anonymous source for you, who wants to give you a bunch of money in recognition of the great work you're doing and it comes in from anonymous, and you have the same sort of evasion but the other flip side of that is maybe if you take anonymous donations you can't engage in election and communications either way there's a real problem here the FEC was faced with a difficult problem it had a legislative solution that Congress had established when Congress had revisited the act to set up the election and communications provisions, Congress hadn't changed that existing standard and the FEC used that standard that cannot be irrational alright thank you, case will be submitted
judges: Brown, Sentelle, Randolph